**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

**GLOBUS MEDICAL, INC.,**

   **Plaintiff,**

v.              **Case No. 2:22cv282**

**SHANE JAMISON, et al.,**

   **Defendants.**

## <u>REPORT AND RECOMMENDATION</u>

  This action arises out of a prior relationship between Globus Medical, Inc. ("Globus") and a group of eleven sales representatives working on behalf of Sky Surgical, Inc. ("Sky Surgical") to sell Globus's spinal products in several regions throughout Virginia. As the result of an Exclusive Distributor Agreement and accompanying amendments ("EDA") between Sky Surgical and Globus, Sky Surgical was the exclusive distributor for Globus products in several regions of the state of Virginia. Each of the eleven sales representatives executed a non-compete, non-disclosure, non-solicitation agreement ("NCNDA") with Globus, and generally agreed to not compete for a term of one year following any termination of relationship between Globus and Sky Surgical. Globus and Sky Surgical renewed the EDA several times throughout the years, but after failed attempts to renew the agreement in the last year, the EDA expired on June 29, 2022. Each of the eleven sales representatives now works for JBC Spine, who distributes spinal products for SeaSpine, Inc. ("SeaSpine")—a direct competitor of Globus. Globus generally contends that the sales representatives' actions involving JBC Spine/SeaSpine, both before and after the termination of the relationship between Sky Surgical and Globus, violated and continues to violate their NCNDAs. Globus filed this action alleging breach of contract, unjust enrichment, and tortious

interference with contractual relationship as a result of the sales representatives' actions and seeks a preliminary injunction to enforce the sales representatives' compliance with their NCNDAs. Presently before the Court is Globus's Amended Motion for Preliminary Injunction, ECF No. 63.

## I.   PROCEDURAL HISTORY

### A.   Motion for a Preliminary Injunction

Globus initiated this action by filing a Complaint seeking injunctive relief and monetary damages on July 7, 2022, against Defendants Shane Jamison, Mike Ruane, Mike Jones, Jake Schools, Scott Van Gilder, Sarah Gregory, and Nick Walker (collectively, "the Tidewater Defendants").[1] ECF No. 1 at 2. On July 29, 2022, United States District Judge Smith entered the parties' agreed order for entry of a preliminary injunction hearing and briefing schedule. ECF No. 27. Therein, the parties agreed to certain deadlines for discovery and agreed that all discovery must be completed by September 30, 2022. *Id.* at 2. The parties also agreed to schedule a three-day hearing on the motion for a preliminary injunction. *Id.* at 3. On August 4, 2022, the Court scheduled a hearing on Globus's motion for a preliminary injunction for December 7, 2022.

On August 11, 2022, Globus filed an Amended Complaint for injunctive relief and monetary damages, which added three defendants to the case—Curt McLeod, Terry McLeod, and Scott Brooks (collectively, "the Richmond Defendants"). ECF No. 35. Globus subsequently requested, and the Court granted, permission to amend its motion for a preliminary injunction to include allegations against the Richmond Defendants. ECF Nos. 55, 59. Accordingly, the lawsuit

---

[1] Additionally on July 7, 2022, Globus filed a complaint for injunctive and monetary relief against Sky Surgical and its president, Jay Jamison, in the Eastern District of Pennsylvania. *Globus Medical, Inc. v. Sky Surgical, et al.*, Case No. 2:22cv2626, ECF No. 1 (E.D. Pa. Jul. 6, 2022). In that case, the parties entered an agreed preliminary injunction on January 17, 2023. *Id.*, ECF No. 37. That litigation otherwise remains ongoing.

involves Globus's allegations against both the Tidewater Defendants and the Richmond Defendants (collectively, "Defendants").

Globus then filed the instant Amended Motion for a Preliminary Injunction and accompanying memorandum in support on November 16, 2022. ECF No. 63–64.[2] Accompanying its Amended Motion for a Preliminary Injunction, Globus filed a Motion to File Certain Portions of Plaintiff's Amended Motion for Preliminary Injunction under Seal ("the motion to seal"), ECF No. 66. Additionally, on December 2, 2022—five days before the scheduled hearing on the motion for a preliminary injunction—Globus filed a Motion for Sanctions based upon Spoliation ("the spoliation motion"). ECF Nos. 76, 77. The Court then issued an Order removing the hearing on Plaintiff's Amended Motion for Preliminary Injunction from the docket, citing the December 5 due date for Defendants' responses to the Amended Motion for Preliminary Injunction, and Plaintiff's "extremely broad" motion to seal. ECF No. 78. The Court instead set a status hearing to be held on December 7, 2022. Before the status hearing, on December 5, 2022, Defendants filed their opposition to Plaintiff's Amended Motion for a Preliminary Injunction. ECF No. 81. Additionally, Defendants filed a Motion in Limine to Exclude Certain Evidence from the Evidentiary Hearing and Post-Hearing Submissions Regarding Plaintiff's Motion for a Preliminary Injunction ("the motion in limine"). ECF No. 82.

B. Referral to the Undersigned

Judge Smith held a status hearing on December 7, 2022, regarding the pending motions before the Court. ECF No. 84. Following the hearing, Judge Smith entered an Order referring the outstanding pretrial motions to the undersigned—including the motion to seal, the spoliation motion, and the motion in limine—and instructed that those motions be resolved *prior to* a hearing

---

[2] Globus filed its exhibits to the Amended Motion for Preliminary Injunction under seal, and accordingly those exhibits are listed as attachments to ECF No. 70.

on Plaintiff's Amended Motion for Preliminary Injunction. ECF No. 85 at 1–2.  Judge Smith then referred the Amended Motion for Preliminary Injunction, ECF No. 63, to the undersigned to conduct hearings and submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. 636(b)(1)(B), Federal Rule of Civil Procedure 72(b)(1), and Standing Order of Assignment of Certain Matters to United States Magistrate Judges, Part IV.B (E.D. Va., Norfolk and Newport News Divisions, Apr. 2, 2002).[3]  ECF No. 85 at 2–3.

C. <u>Resolution of the Outstanding Pretrial Motions</u>

With respect to the motion to seal, after additional briefing, the Court issued an order on January 12, 2023, granting the motion to seal as modified by the additional briefing. ECF No. 99. With respect to the motion for spoliation and motion in limine, the Court held a hearing on those motions on January 30, 2023, and took the motions under advisement. ECF No. 100.  Following the hearing, on February 10, 2023, the Court issued written orders denying the motion for spoliation, ECF No. 76, and denying the motion in limine, ECF No. 82. ECF Nos. 102–03.  The Court then scheduled a four-day evidentiary hearing on Plaintiff's Amended Motion for Preliminary Injunction to begin April 24, 2023. ECF No. 63.

D. <u>The Evidentiary Hearing</u>

On the first day of the evidentiary hearing, counsel for Globus and Defendants gave opening statements regarding the Amended Motion for a Preliminary Injunction. *See* ECF No. 136.  The Court heard testimony from Justin Hyde, Vice President of Sales for Globus. *Id.*  On the second day of the hearing, Globus informed the Court that it was proceeding with its preliminary injunction claim against *only* the Richmond Defendants—Curt McLeod, Terry McLeod, and Scott Brooks. *See* ECF No. 137.  The Court then heard testimony from Curt McLeod.

---

[3] Since then, the case has been reassigned to United States District Judge Walker.

*Id.* On the third day of the hearing, the Court heard testimony from Terry McLeod, as well as Kurt Reighard, who was formerly affiliated with Globus, and is the President of JBC Spine, which sells SeaSpine products. *See* ECF Nos. 138–39. Additionally, the Court heard more testimony Justin Hyde, who Plaintiff recalled as a witness, and video deposition testimony by designation from Nicole McGee, a scheduler at Memorial Regional Hospital in Richmond. *Id.* Finally, on the last day of the hearing, the Court heard more testimony from Justin Hyde, who Plaintiff again recalled, as well as from Scott Brooks. *See* ECF No. 140. The parties presented their closing arguments, and the Court ordered the parties to submit proposed findings of fact and conclusions of law, and to submit separate position papers regarding the potential implications of the Federal Trade Commission's proposed rule barring non-compete agreements on the public interest factor of the standard for a preliminary injunction. *Id.*

### E. Post-Hearing Submissions

On May 15, 2023, Globus submitted its proposed findings of fact and conclusions of law, ECF No. 133 ("Globus PFF"), as did the Richmond Defendants, ECF No. 132 ("Defendants PFF"). In Globus's proposed findings of fact and conclusions of law, Globus conceded its tortious interference and unjust enrichment claims need not be considered for the purposes of the preliminary injunction motion. ECF No. 133 at 26, n. 12. On the same day, the parties submitted their position papers on the Federal Trade Commission's proposed rule banning non-compete agreements. ECF No. 134 (Globus's Position Paper); ECF No. 135 (The Richmond Defendants' Position Paper).

## II.   FINDINGS OF FACT

Despite the parties' submissions of voluminous proposed factual findings and the extensive evidence presented at the evidentiary hearing, the Court limits its findings to only those facts

necessary to resolve the Amended Preliminary Injunction Motion.  Accordingly, the Court makes the following findings of fact, based on the evidence and testimony proffered by the parties:

<u>The Relationships Between Globus, Sky, and the Richmond Defendants</u>

1.      Globus manufactures spinal implants and hardware. Globus PFF ¶ 1; Defendants PFF ¶ 1.

2.      Globus uses third-party distributors, who hire or contract with sales representatives to distribute, promote, market, and sell its products.  Globus PFF ¶ 1.

3.      For approximately fifteen years, Sky Surgical was the exclusive third-party distributor in several areas in Virginia.  Globus PFF ¶ 2; Defendants PFF ¶ 2.  Jay Jamison was the principal of Sky Surgical.  Defendants PFF ¶ 2.

4.      The Richmond Defendants, Curt McLeod, Terry McLeod, and Scott Brooks, worked as sales representatives for Sky Surgical.  Globus PFF ¶ 2; Defendants PFF ¶ 3.

5.      An EDA governed the relationship between Globus and Sky, and the EDA was renewed yearly to continue the relationship.  Defendants PFF ¶¶ 2–5.

6.      On December 1, 2021, Globus informed Jay Jamison by a letter that Globus intended to terminate the EDA, and that it would not automatically renew, effective December 31, 2021.  Defendants PFF ¶ 5.  However, Globus and Sky Surgical continued to discuss extending the relationship, and entered into a series of monthly extensions to the EDA's term.  Defendants PFF ¶¶ 6–7.

7.      The last monthly extension of the EDA expired on June 30, 2022.  Defendants PFF ¶ 7; *see also* Globus PFF ¶ 10.

6

The NCNDAs

8.      As required by Globus, each Richmond Defendant signed a non-compete, non-disclosure, and non-solicitation agreement, commonly referred to by the parties as an NCNDA. Globus PFF ¶¶ 6, 7; *see also* Pl. Exh. 53 (Scott Brooks's NCNDA); Pl. Exh. 56 (Terry McLeod's NCNDA); Pl. Exh. 82 (Curt McLeod's NCNDA). The provisions in Terry McLeod's and Scott McLeod's NCNDAs are identical. *See* Pl. Exh. 56; Pl. Exh. 82. Scott Brooks's NCNDA varies slightly from the Terry McLeod's and Curt McLeod's NCNDA. *See* Pl. Exh. 53.

9.      Section 1.3 of all three NCNDAs contain a provision that the sales representatives agree:

> [t]o not engage in any Competitive Activity with any Hospitals or Medical Personnel during the No Competition Period in the NCND Territory…[and to] not directly, or indirectly, either for the Agent's benefit or the benefit of another entity, solicit, call on, interfere with, or attempt to divert, entice away, sell to or market to any customer, Hospital or Medical Personnel in the NCND Territory.[4]

Pl. Exh. 53; Pl. Exh. 56; Pl. Exh. 82.

10.      The NCNDAs define Hospitals as "hospitals, surgery centers, medical centers and other healthcare facilities . . ." and Medical Personnel as "orthopedic surgeons, neuro-surgeons, physicians, nurses and other medical personnel . . . " Pl. Exh. 53; Pl. Exh. 56; Pl. Exh. 82.

11.      The NCNDAs define the "No Competition Period" as "the time period encompassing both the Agency Agreement Term and the 12-month period immediately after the termination of the Agency Agreement." Pl. Exh. 53; Pl. Exh. 56; Pl. Exh. 82.

12.      The parties agree that the NCNDAs define the NCND Territory as "any Hospitals and/or Medical Personnel to which Agent was assigned within the most recent 12 months" of their

---

[4] Unless otherwise explained, the language in Scott Brooks NCNDA varies slightly, but not materially for the purposes of this motion, from this language. *See* Pl. Exh. 53.

affiliation with Globus.  Pl. Exh. 53; Pl. Exh. 56; Pl. Exh. 82; Globus PFF ¶ 7; Defendants PFF ¶ 16.

13.    Taking these provisions together, the Richmond Defendants agreed in their NCNDAs that during their relationship with Globus and for at least 12 months after the relationship ends, they would not "directly or indirectly . . . solicit, call on, interfere with, or attempt to divert, entice away, sell to or market to" any hospitals or surgeons to which they were "assigned" during the 12-month period preceding the end of their relationship with Globus.  Globus PFF ¶ 7.

14.    Section 3.1 of all three NCNDAS provides that the sales representatives agree "that the limitations set forth in this NCND Agreement are properly required for the adequate protection of the business of the Company and/or Globus, and that violation of any of the provisions of this NCND Agreement will cause irreparable injury for which money damages are neither adequate nor ascertainable." Globus PFF ¶ 8; Pl. Exh. 53; Pl. Exh. 56; Pl. Exh. 82.

15.    All three NCNDAs provide that the NCNDA is governed by Pennsylvania law. Globus PFF ¶ 7; *see also* Pl. Exh. 53 (Section 4.6); Pl. Exh. 56 (Section 4.4); Pl. Exh. 82 (Section 4.4).

16.    Scott Brooks' NCNDA contains a tolling provision in Section 4.9 that states "in the event of any breach of his[] obligations under paragraph[] 1.3…of this NCND Agreement, the No Competition Period shall be automatically tolled for the amount of time the violation continues. Pl. Exh. 53.

17.    Based on the language in the NCNDAs, the Richmond Defendants were prohibited from soliciting, calling on, interfering with, attempting to divert, entice away, sell to, or market to any surgeons or hospitals to which they were "assigned" during the twelve-month period preceding the end of their relationship with Globus.

18.     The NCNDAs do not prohibit "flip-flopping," whereby for the twelve-month period following the end of their relationship with Globus, a sales representative may switch territories that he or she is "assigned" with another sales representative who was not "assigned" that territory in the preceding twelve months.  Defendants PFF ¶ 81.

### The Breakdown of the Relationship Between Globus and Sky Surgical, and the Formation of JBC Spine

19.     Between December 31, 2021, and June 30, 2022, the relationship between Globus and Sky Surgical was governed by monthly extensions to the EDA.  Defendants PFF ¶¶ 5, 7.  Globus and Sky Surgical, through Jay Jamison, continued discussing the terms of their business relationship.  Defendants PFF ¶¶ 7, 8.

20.     Jay Jamison began exploring other options, including with another medical device company, SeaSpine.  Defendants PFF ¶¶ 9, 10.  SeaSpine is a competitor of Globus.  Globus PFF ¶ 12; Defendants PFF ¶ 10.

21.     During this time, Kurt Reighard founded JBC Spine for the purpose of becoming a SeaSpine distributor.  Defendants PFF ¶ 11.

22.     Globus wanted to bring the Richmond Defendants and Jay Jamison on as direct employees of Globus, as opposed to independent sales representatives.  Defendants PFF ¶ 8.

23.     On June 24, 2022, Globus sent offer letters to Scott Brooks, Curt McLeod, and Terry McLeod.  Defendants PFF ¶ 52; Def. Exh. 53.

24.     Scott Brooks's offer from Globus letter identified Scott Brooks's territory as: Memorial Regional and Henrico Doctors – Parham Campus.  Defendants PFF ¶ 52; Def. Exh. 53.

25.     Curt McLeod's offer letter from Globus identified Curt McLeod's territory as: Chippenham Hospital, Henrico Doctor's – Forest Campus, St. Mary's Hospital, Southside Regional, St. Francis, and VCU.  Defendants PFF ¶ 52; Def. Exh. 53.

9

26.     Terry McLeod's offer letter from Globus identified Terry McLeod's territory as Johnston-Willis Hospital.  Defendants PFF ¶, 61; Def. Exh. 53.

27.     In communications with Globus to negotiate offers of direct employment, Curt McLeod stated to David Hole, President of Globus, "we currently have individual account responsibility."  Defendants PFF ¶ 52; Def. Exh. 52.  David Hole stated in response that he "would like to see [the offer letters] broken out by individual account responsibility. It is certainly the cleanest and safest way to go at this. We can assign by surgeon and split accounts if needed . . . For now, just get me account responsibility with surgeons."  Defendants PFF ¶ 52; Def. Exh. 52.

28.     In response, to David Hole, Curt McLeod noted that he was responsible for Chippenham Hospital, Henrico Doctor's – Forest Campus, St. Mary's Hospital, Southside Regional, St. Francis, and VCU; that Terry McLeod was responsible for Johnston Willis Hospital; and Scott Brooks was responsible for Memorial Regional and Henrico Doctor's – Parham Campus. Defendants PFF ¶ 52; Def. Exh. 52.

29.     In internal Globus communications involving drafting offers of employment for the Richmond Defendants, David Hole asked another Globus employee to draft offer letters "including the blow [sic] accounts *assigned* to each along with the blow [sic] language."  Def. Exh. 52 (emphasis added); Defendants PFF ¶ 53.  The "b[e]low accounts" corresponded with the "individual account responsibility" that Curt McLeod sent to David Hole.  Def. Exh. 52.

30.     In internal Globus communications between Justin Hyde and Gregg Harris, Globus personnel referred to Dr. Reis as "Scott Brook's [sic] guy," and "Scott's main guy."  Defendants PFF ¶ 39.

31.     After the EDA expired on June 30, 2022, Globus and the Richmond Defendants continued to negotiate their relationship.  Globus PFF ¶ 11.

32.     After the EDA expired on June 30, 2022, the Richmond Defendants continued to cover Globus surgeries.  Globus PFF ¶ 10; Defendants PFF ¶¶ 38, 51.  The Richmond Defendants were not compensated for their sales after June 30, 2022.  Defendants PFF ¶¶ 38, 51, 60.

33.     On July 27, 2022, JBC Spine sent offer letters to Scott Brooks, Terry McLeod, and Curt McLeod, identifying that they would work on the "Central VA Team."  Globus PFF ¶ 36; *see also* Pl. Exhs. 46, 48, 106.

34.     The Richmond Defendants negotiated with SeaSpine as a group.  Globus PFF ¶ 36.  The Richmond Defendants negotiated an agreement whereby they would each receive a monthly indemnification from SeaSpine if they were subject to an injunction.  Globus PFF ¶¶ 36, 77.

35.     On August 3, 2022, the Richmond Defendants informed Globus they were ending the relationship.  Globus PFF ¶ 11.  The next day, the Richmond Defendants became sales representatives for SeaSpine, operating through JBC spine.  Globus PFF ¶ 11.

<u>The Relationships Between the Sales Representatives and the Surgeons</u>

36.     The sales representatives' roles are "service-based" and involve developing close relationships with surgeons and staff.  Globus PFF ¶ 3.

37.     Sales representatives have access to Globus's confidential information, including sales planning, strategy, pricing, product development, sales data, and surgeon preferences.  Globus PFF ¶ 5.

38.     Globus requires its sales representatives to sign NCNDAs to protect its investment in relationships with sales representatives, goodwill, and confidential information.  Globus PFF ¶ 6.

39.     During their time at Globus, all three Richmond Defendants were grouped together in Globus's internal sales system for the Richmond area accounts, including Chippenham Medical

Center, Johnston Willis, Henrico Doctors Hospital – Forest Campus, Henrico Doctors Hospital – Parham Campus, John Randolph Medical Center, Mary Washington Hospital, Memorial Regional Medical Center, Southside Regional Medical Center, St. Francis, St. Mary, and VCU Health System.  Globus PFF ¶ 16; Pl. Exh. 67.

40.     Globus considered the Richmond Defendants a "super-territory" because they were grouped together in Globus's system.  Globus PFF ¶ 21.

41.     No other sales representatives affiliated with Sky Surgical were listed as a group with other sales representatives.  Globus PFF ¶ 18.

42.     Justin Hyde testified that the Richmond Defendants were grouped together in Globus's internal sales system at the direction of Jay Jamison, and that Jay Jamison assigned accounts for Globus on behalf of Sky Surgical.  Globus PFF ¶¶ 17, 20.

43.     The following table is a visual depiction of the relevant surgeons and hospitals with which the Defendants worked during their last twelve months at Sky Surgical/Globus and now with JBC Spine/SeaSpine, as discussed by the Court in further detail below.[5]

---

[5]  Though the Richmond Defendants were assigned various hospitals and surgeons as explained in the Court's findings of fact ¶¶ 24–29, 39, Globus's requested a preliminary injunction only as to these doctors and hospitals in the table in finding of fact ¶ 43.  *See* ECF No. 108, attach. 1.  In Globus's proposed recommendation, it states "[f]or avoidance of doubt, the Restricted Surgeons and Hospital Personnel for each respective Defendant are set forth in a separate addendum exchanged by the Parties and their counsel ("Addendum A")."  *Id.*  Globus did not include Addendum A in its filings to the Court.  However, Globus's proposed conclusions of law states that the NCNDAs "restrict the Richmond Defendants with respect to only *four* hospitals and *four* surgeons in Richmond."  ECF No. 133 at 28.  Between this statement, and Globus's presentation of evidence at the evidentiary hearing, the Court concludes Globus is only requesting an injunction apply to the Richmond Defendants activities at: (1) Memorial Regional Hospital; (2) Henrico Doctors' Hospital – Parham; (3) Chippenham Hospital; and (4) Johnston-Willis Hospital, and with (1) Dr. Gocke; (2) Dr. Reis; (3) Dr. Melisi; and (4) Dr. Herzog.

| Table 1 | | |
|---------|---|---|
| **Defendant** | **Alleged Assignment with Sky/Globus August 3, 2021, to August 3, 2022** | **Alleged Assignments for JBC/SeaSpine August 4, 2022, to the present** |
| **Scott Brooks** | Memorial Regional Hospital Henrico Doctors' Hospital – Parham Campus Dr. Reis Dr. Melisi | Johnston-Willis Hospital Dr. Herzog |
| **Curt McLeod** | Chippenham Hospital Dr. Gocke | Johnston-Willis Hospital Dr. Herzog Dr. Reis[6] |
| **Terry McLeod** | Johnston-Willis Hospital Dr. Herzog | Memorial Regional Hospital Henrico Doctors' Hospital – Parham Campus Dr. Reis Dr. Melisi |

44.     During his last year as a sales representative for Globus, Scott Brooks primarily worked with Drs. Reis and Melisi, and at Memorial Regional Hospital and Henrico Doctor's Hospital – Parham Campus.  Defendants PFF ¶ 22.

45.     Since August 3, 2022, when Scott Brooks began working with JBC Spine to sell SeaSpine products, Scott Brooks primarily works with Dr. Herzog at Johnston-Willis Hospital. Defendants PFF ¶ 40.

46.     During his last year as a sales representative for Globus, Curt McLeod primarily worked with Dr. Gocke and Chippenham Hospital.  Globus PFF ¶ 41; Defendants PFF ¶ 43.

47.     Since August 3, 2022, when Curt McLeod began working with JBC Spine to sell SeaSpine products, Curt McLeod primarily works at Johnston-Willis Hospital with Dr. Josh Herzog.  Globus PFF ¶ 52; Defendants PFF ¶ 54.

---

[6] *See* Findings of Fact ¶ 48, *infra*.  The Court finds Curt McLeod is likely assigned to Dr. Reis at JBC Spine/SeaSpine.

48.     Since August 3, 2022, when Curt McLeod began working with JBC Spine to sell SeaSpine products, it is likely that Curt McLeod is also assigned Dr. Reis.  Dr. Reis submitted a declaration that both Curt McLeod and Terry McLeod cover his SeaSpine surgeries.  Globus PFF ¶ 54; *see also* Def. Exh. 75.

49.     It is, at best, unclear whether and to what extent Curt McLeod works with Dr. Melisi now that he is affiliated with JBC Spine and selling SeaSpine products.  Scott Brooks stated at his deposition that Curt McLeod covers SeaSpine procedures for Dr. Melisi.  Globus PFF ¶ 53.  At the evidentiary hearing, Scott Brooks denied that he had knowledge as to whether Curt McLeod covers procedures for Dr. Melisi.  Globus PFF ¶ 53.  On August 4, 2022, after the Richmond Defendants moved to SeaSpine, Curt McLeod informed Nicole McGhee that Dr. Melisi was going to use SeaSpine products that day, despite not working with Dr. Melisi during his last twelve months at Globus or working with him during his affiliation with SeaSpine.  Curt McLeod claimed to not have spoken with Dr. Melisi about the switch but felt confident Dr. Melisi would switch based on his past conversations with him.  Globus PFF ¶ 47.

50.     During his last year as a sales representative for Globus, Terry McLeod primarily worked with Dr. Herzog at Johnston-Willis Hospital.  Globus PFF ¶ 56; Defendants PFF ¶ 56.

51.     After August 3, 2022, when Terry McLeod began working with JBC Spine to sell SeaSpine products, Terry McLeod primarily works with Drs. Reis and Melisi, and at Memorial Regional Hospital and Henrico Doctor's Hospital – Parham Campus.   Globus PFF ¶ 61; Defendants PFF ¶ 66.

### The Relationship Between the Richmond Defendants and Their Businesses

52.     The Richmond Defendants work together to operate as sales representatives.  Globus PFF ¶¶ 13, 30, 37.

53.     The Richmond Defendants held themselves out as a team to the Richmond Hospitals and surgeons, and those hospitals and surgeons viewed them as a team.  Globus PFF ¶ 30.

54.     In a text message on August 23, 2022, Curt McLeod referred to the Richmond Defendants as a team.  Globus PFF ¶ 31.

55.     Nicole McGhee, a scheduler at Memorial Regional, viewed the Richmond Defendants as a team.  Globus PFF ¶ 35.

56.     When Nicole McGhee had complaints about Scott Brooks's service at Memorial Regional, she discussed them with Curt McLeod.  Globus PFF ¶ 33.

57.     While operating as sales representatives for Globus and now with SeaSpine, the Richmond Defendants share their commissions equally, regardless of which Defendant earned the commission.  Globus PFF ¶¶ 22, 37; Defendants PFF ¶ 71.

58.     The Richmond Defendants chose to arrange their compensation in this manner because their surgeons are their sole source of income, and this arrangement protects the sales representatives if something happens to that surgeon.  Defendants PFF ¶ 70.

59.     The Richmond Defendants collectively share an associate, Don Barbieri, to assist them in their work.  Globus PFF ¶¶ 26, 38.

60.     The Richmond Defendants used a single sales representative number to order products.  Globus PFF ¶ 23; Defendants PFF ¶ 59.

61.     Each Richmond Defendant could order product for any of the other Richmond Defendant's hospitals and surgeons.  Globus PFF ¶ 23.

62.     No evidence was proffered that any of the Richmond Defendants did, in fact, order product for any of the other Richmond Defendant's hospitals and surgeons.  *See e.g.*, Defendants

PFF ¶ 34 ("Only Scott Brooks ordered for memorial regional and did not do so for Chippenham or Johnston-Willis").

63.    The Richmond Defendants could see each other's orders, which contained highly confidential, hospital-specific, pricing information. Globus PFF ¶ 24. The Richmond Defendants requested, and Globus prepared, an email each day summarizing all orders. Globus PFF ¶ 25.

64.    Nicole McGhee sent weekly emails about surgeries at Memorial Regional to all three Richmond Defendants, even though Scott Brooks was the one primarily working at the hospital. Globus PFF ¶¶ 32, 45. At least once, Nicole McGhee sent an email to only the McLeods. Globus PFF ¶ 32. The McLeods never asked Nichole McGhee to remove them from her emails. Globus PFF ¶ 32.

65.    Johnston Willis sent weekly emails about surgeries at that hospital to both Curt McLeod and Terry McLeod, even though Terry McLeod was only primarily working with Dr. Herzog. Globus PFF ¶¶ 34, 48.

66.    An injunction would not negatively impact the patient care in the Richmond area if the Richmond Defendants were subject to an injunction. Globus PFF ¶ 79–81.

<u>The Duties of the Sales Representatives</u>

67.    When sales representatives are assigned to accounts, they have certain responsibilities, including discussing the surgery with the surgeon, preparing surgical trays, ensuring that all instrumentation and implants are sterilized and ready for use, managing inventory in the hospital, restocking trays, training surgeons and staff, and introducing new products. Defendants PFF ¶¶ 27–29, 57.

68.    When a sales representative is assigned to an account, they are also responsible for scheduling with the surgeon's staff. Defendants PFF ¶ 27.

Coverage

69.     Historically, the Richmond Defendants cover surgical cases for one another if one cannot attend a case.  Globus PFF ¶ 29.

70.     When the Richmond Defendants covered cases for one another, the covering sales representative does not prepare surgical trays, ensure that all instrumentation and implants are sterilized and ready for use, manage inventory in the hospital, restock trays, train surgeons and staff, or introduce new products.  Defendants PFF ¶¶ 30, 36, 45; *see also* Defendants PFF ¶¶ 48, 58.

71.     During the last twelve months he was affiliated with Globus, Scott Brooks covered at least two cases for Dr. Herzog at Johnston-Willis because Terry McLeod had a conflict. Defendants PFF ¶ 37, 58.

72.     Since August 3, 2022, when Scott Brooks began working with JBC Spine to sell SeaSpine products, Scott Brooks covered one surgery on behalf of Terry McLeod for Dr. Melisi— from whom he was restricted from working.  Globus PFF ¶ 67; Defendants PFF ¶ 42.  This surgery was at St. Mary's Hospital, where Scott Brooks had not worked in his last twelve months affiliated with Globus.  Defendants PFF ¶ 42. Since joining JBC Spine and selling SeaSpine products, Scott Brooks has not covered any cases with Dr. Reis.  Defendants PFF ¶ 41.

73.     Since August 3, 2022, when Scott Brooks began working with JBC Spine to sell SeaSpine products, either Scott Brooks covered one surgery for Dr. Melisi, or the Richmond Defendants' associate, Don Barberi, covered a surgery for Dr. Melisi.  Globus PFF ¶ 67.

74.     During his last twelve months affiliated with Globus, Curt McLeod covered at least four cases for Dr. Melisi at Memorial Regional Hospital because Scott Brooks had a conflict.

Globus PFF ¶ 44; Defendants PFF ¶ 46.  Curt McLeod did not cover any cases for Dr. Herzog or Dr. Reis during his last twelve months affiliated with Globus.  Defendants PFF ¶¶ 32, 37, 47, 55.

75.     After August 3, 2022, when Curt McLeod began working with JBC Spine to sell SeaSpine products, there is no evidence that Curt McLeod covered any surgeries on behalf of either Terry McLeod or Scott Brooks.

76.     During his last year as a sales representative for Globus, Terry McLeod covered at least two cases for Dr. Melisi at Memorial Regional Hospital because Scott Brooks had a conflict. Defendants PFF ¶ 67.  During his last year as a sales representative for Globus, Terry McLeod did not cover any cases for Dr. Reis.  Defendants PFF ¶ 67.

77.     After August 3, 2022, when Terry McLeod began working with JBC Spine to sell SeaSpine products, there is no evidence that Terry McLeod has covered surgeries for anyone other than Dr. Reis and Dr. Melisi.

Globus's Business After August 3, 2022

78.     Dr. Gocke, who previously worked with Curt McLeod, remains a Globus customer. Defendants PFF ¶ 50.

79.     Dr. Herzog has not used Globus spinal hardware products regularly since August 3, 2022.  Globus PFF ¶ 72.  He has done fewer than five surgeries using Globus spinal hardware products since that time.  Globus PFF ¶ 72; Defendants PFF ¶ 84.  Dr. Herzog is a design consultant for Globus and is on Globus's faculty to teach courses.  Defendants PFF ¶ 84.

80.     Dr. Reis no longer uses Globus's spinal hardware products since August 3, 2022. Globus PFF ¶ 71.  During the Richmond Defendants' last twelve months at Globus, Globus's sales for Dr. Reis's surgeries totaled $2.6 million.  Globus PFF ¶ 71.

18

81.     Since August 3, 2022, Dr. Reis does still use a Globus robot, and has a service contract on that robot. Globus PFF ¶ 71; Defendants PFF ¶ 85. However, Globus only sells small volume and money products for the robot such as drill bits and curtains. Globus PFF ¶ 71; Defendants PFF ¶ 85.

82.     Dr. Melisi no longer uses Globus products. Globus PFF ¶ 73.

83.     Globus has lost 90% of its business in the Richmond area. Globus PFF ¶ 74.

84.     Globus believes it could save some of its lost business in Richmond if given the chance to compete fairly. Globus PFF ¶ 76.

### III.     CONCLUSIONS OF LAW

Globus seeks to enjoin the Richmond Defendants from "solicit[ing]…any Virginia spine surgeons (or hospital personnel who support such surgeons) to use or purchase SeaSpine or any other company's spinal-implant or biologics products" and requests that the restriction apply to "persons whom [the Richmond] Defendants personally sold (or were part of a team that sold) Globus products during the last 12 months of their respective [NCNDAs] (the 'Respective Restricted Surgeons and Hospital Personnel')." ECF No. 108, attach. 1. Globus further seeks to enjoin the Richmond Defendants from "assist[ing] or provid[ing] information to assist…any SeaSpine or other company's agents' efforts to solicit any their [sic] Respective Restricted Surgeons and Hospital Personnel to use or purchase SeaSpine or any other company's spinal-implant or biologics products." *Id.*

A. Choice of Law

As a preliminary matter, the Court must address what law will apply to this action. Federal courts exercising diversity jurisdiction apply the substantive law of the forum state, and federal procedural law. *Skyline Restoration, Inc. v. Church Mut. Ins. Co.*, 20 F.4th 825, 829 (4th Cir.

2021) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 79–80 (1938)); *Atlantic Diving Supply, Inc. v. Basnight*, No. 2:22cv298, 2022 WL 5568083, at *5 (E.D. Va. Sept. 21, 2022) (applying federal standards to a preliminary injunction). Application of the substantive law of the forum state includes the state's choice-of-law rules—in this case, Virginia's choice of law rules. *See Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013). Absent unusual circumstances, "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) (citing *Tate v. Hain*, 181 Va. 402 (Va. 1943)). In the NCNDA, the governing document in this case, the parties agreed that Pennsylvania law would apply to the substantive issues in any action arising out of the NCNDA.

Here, there is no indication of unusual circumstances whereby a Virginia court would not honor the parties' choice of law provision. Given these standards, the Court applies federal procedural law and Pennsylvania substantive law to this action.

B. Preliminary Injunction Standard & Analysis

Preliminary injunctions are "extraordinary remedies involving the exercise of very far-reaching power" and accordingly should only be granted "sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citing *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1992)). In order to receive a preliminary injunction, a plaintiff must "'establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *WV Ass'n of Club Owners & Fraternal Servs. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Each preliminarily injunction factor must be "'satisfied as articulated.'" *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (citation omitted). Accordingly, "[c]ourts considering whether

to impose preliminary injunctions must separately consider each [] factor." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citing *Pashby*, 709 F.3d at 321).

In engaging in this inquiry, the Court is mindful that "'[t]he purpose of an injunction is to prevent future violations,' and the party seeking such relief 'must satisfy the court that [prospective, injunctive] relief is needed.'" *Davison v. Rose*, 19 F.4th 626, 641 (4th Cir. 2021) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). A preliminary injunction is not intended to "remedy past harm[,] but to protect plaintiffs from irreparable injury that will surely result without their issuance." *Action N.C. v. Strach*, 216 F. Supp. 3d 597, 644 (M.D.N.C. 2016) (internal quotations omitted) (quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005)).

### 1. Likelihood of Success on the Merits

In considering a motion for a preliminary injunction, the Court first looks to the Plaintiff's likelihood of success on the merits. While the plaintiff "need not establish a 'certainty of success,'" the plaintiff "must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citing *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013)). Here, the Court must look to the likelihood of success of Globus's breach of contract claim. To succeed on a breach of contract claim under Pennsylvania law, a plaintiff must demonstrate: "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).

The issues in this case arise out of allegations of a breach of a restrictive covenant. Restrictive covenants such as covenants to not compete "are commonly relied upon by employers to shield their protectible business interests." *Hess v. Gebhard & Co.*, 808 A.2d 912, 917 (2002).

Such provisions are enforceable if (1) "they are incident to an employment relationship between the parties;" (2) "the restrictions imposed by the covenant are reasonably necessary for the protection of the employer;" and (3) "the restrictions imposed are reasonably limited in duration and geographic extent." *Id.* (citation omitted). In Pennsylvania, restrictive covenants on employment are "not favored . . . and have been historically viewed as a trade restraint that prevents a former employee from earning a living." *Id.* (citation omitted). Thus, Pennsylvania law "permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer's protectible business interests." *Id.* (citing *Reading Aviation Serv. Co. v. Bertolet*, 311 A.2d 628 (Pa. 1973)). "[R]easonableness under Pennsylvania law is a fact-intensive inquiry; indeed, '[a] restrictive covenant found to be reasonable in one case may be unreasonable in others.'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 237 (3d Cir. 2007) (second alteration in original) (quoting *Insulation Corp. of Am. v. Brobston*, 667 A.2d 729, 734 (Pa. Super. Ct. 1994)).

The parties agree that through the NCNDAs, the Richmond Defendants promised that, during their relationship with Globus and for at least twelve months after the termination of their relationship, they would not "directly or indirectly . . . solicit, call on, interfere with, or attempt to divert, entice away, sell to or market to" any surgeons or hospitals to which they were "assigned." Further, the parties agree that the practice of "flip-flopping," whereby the sales representatives swap surgeons following the termination of their relationship with Globus, is generally not prohibited by the NCNDA so long as it is executed properly. *See* ECF No. 136 ("there is nothing wrong with the flip-flop plan . . . [t]hey are free to flipflop if they do it without violating their contracts").

Here, the parties do not dispute that the NCNDAs are incident to an employment relationship between the parties, or that the restrictions imposed are reasonably limited in duration and geographic extent.  Rather, the parties dispute whether the restriction is "reasonably necessary for the protection of the employer," and in the same vein, how to construe the restriction that the covenant imposes.  Specifically, Globus argues that the word "assigned" applies to the Richmond Defendants as a collective, in that each Richmond Defendant was collectively assigned to the same hospitals and surgeons that any other Richmond Defendant was assigned.  Globus contends that this construction of "assigned" is necessary to protect its investments in relationships and goodwill with hospitals and surgeons, as well as its confidential information.  However, the Richmond Defendants argue that the word "assigned" applies only to the Richmond Defendants individually, in that each Richmond Defendant was only assigned to the hospitals at which, or surgeons with whom, they primarily worked.  The Richmond Defendants contend that Globus's construction of "assigned" would result in prohibiting activities where the individual Richmond Defendants had not developed goodwill.  They further contend such construction is not reasonably necessary to protect confidential information.

Accordingly, the Court's analysis as to the likelihood of success of Globus's breach of contract claim is a two-step inquiry.  First, the Court must determine whether Globus's construction of the word "assigned," or the Richmond Defendants' construction of the word "assigned" is correct, by looking to which construction is "reasonably necessary for the protection of the employer," based on the facts presented.  *See Hess*, 808 A.2d at 917.  Globus asserts that because the Richmond Defendants acted as a team, they were collectively assigned to the same hospitals and surgeons.  The Richmond Defendants' construction asserts that they were individually assigned certain hospitals and surgeons.  If Globus's construction is correct, then the

Richmond Defendants' practice of "flip-flopping" surgeons and hospitals once they began selling SeaSpine products would suggest that the Richmond Defendants' practice likely violates their NCNDAs and would establish Globus's likelihood of success on the merits. However, if the Richmond Defendants' construction is correct, then the Court must proceed to a second step, and determine whether Globus can establish a likelihood of success on the merits by showing that the Richmond Defendants' current assignments with JBC Spine and selling of SeaSpine products constitutes actions which "directly or indirectly . . . solicit, call on, interfere with, or attempt to divert, entice away, sell to or market to" any hospitals or surgeons to which they were "assigned" during the 12-month period preceding the end of their relationship with Globus. If so, then Globus would establish a "clear showing" that it is likely to succeed on the merits of its breach of contract claim.

a. <u>The Richmond Defendants' Were Individually Assigned to Certain Surgeons and Hospitals.</u>

With respect to the first step of the inquiry, to determine what restrictions are reasonably necessary for the protection of the employer, courts have looked to restrictions that protect customer goodwill and confidential information. Pennsylvania law provides that "[a]n employer's protectable interests include "customer goodwill developed by its employees." *Boldt Mach. & Tools, Inc. v. Wallace*, 366 A.2d 902, 906 (1976) (per curium) (citing *Sidco Paper Co.*, 351 A.2d at 252–54). In *Boldt Machinery & Tools*, the Pennsylvania Supreme Court found that customer goodwill was developed by "direct, personal contact with [the employer's] customers at the customers' places of business," and that direct personal contact "was an important element in making sales." *Id.*

The evidence that the Richmond Defendants acted as a team and were accordingly assigned to the same accounts in their last twelve months affiliated with Globus consists of the following:

the Richmond Defendants were paid equal commissions on all sales of Globus products to each account; they could place orders for each account; they received an email summary at the end of the day detailing the orders for the group; they received weekly communications from schedulers as a collective; they were collectively grouped together in Globus's internal sales system; Scott Brooks' admission the group acted as team; referring to themselves as a team to customers; customers viewed the group was a team; and SeaSpine's offer letters identified their territory as the "Central Virginia Team."

However, the more compelling evidence that the Richmond Defendants were assigned accounts individually includes the following: in the last twelve months the Richmond Defendants were affiliated with Globus, sales representatives assigned to accounts had individual responsibilities, including discussing the surgery with the surgeon, preparing surgical trays, ensuring that all instrumentation is sterilized and ready for use, managing inventory in the hospital, restocking trays, training surgeons and staff, and introducing new products; Globus's offer letters broke out each Richmond Defendants account responsibility/territory; the Richmond Defendants only covered cases for one another on rare occasions, and when they did, that coverage only involved attending the surgery with the surgeon; and the Richmond Defendants each had doctors and hospitals with whom they primarily worked and developed relationships.

Accordingly, Court finds that while the Richmond Defendants may have acted as a "team" in certain respects, the evidence presented during the hearing demonstrates that Globus likely only has a protectable interest in the customer goodwill that was developed by the Richmond Defendants "direct and personal" contact with the surgeons and hospitals with whom the Richmond Defendants were individually assigned.

In evaluating the evidence presented, the Court notes that several specific pieces of evidence particularly worthy of additional discussion.  First, in interpreting what it means to be assigned, and where Globus itself saw that it had protectable goodwill, the Court finds it important to look to how Globus *itself* viewed the Richmond Defendants assignments.  Of particular note, the Court finds it significant that when seeking to extend direct employment offers to the Richmond Defendants, Globus did not extend offers as a team—it extended individual offers to each Richmond Defendant and identified each Richmond Defendants' individual territory.  Globus itself did not look to the evidence it now asks the Court to look to in order to determine that the Richmond Defendants were collectively assigned—such as the fact that the Richmond Defendants shared commissions equally, the fact that the Richmond Defendants are collectively grouped in Globus's internal sales system, or the fact that the Richmond Defendants collectively received a daily email with all sales data.  Rather, Globus prepared offer letters based on individual assignments, and its own representatives inquired the Richmond Defendants about their "*individual* account responsibility."

As further evidence of how Globus itself viewed its protectable goodwill interest and the meaning of "assigned" in the NCNDA, the Court found Defendant's Exhibit 51 discussed at the hearing compelling.  On August 9, 2022, shortly after the Richmond Defendants began selling SeaSpine products and "flip-flopped" their territories, Justin Hyde sent a text message to David Hole stating "Terry covered Reis yesterday. Curt was with Herzog yesterday. Nurse at Memorial [Nicole McGhee,] offered to connect me supply chain people to see if we can pull records of Curt and Terry covering Reis within the last twelve months."   Def. Exh. 51.  The Court finds it significant that again, consistent with the Richmond Defendants' construction of "assigned" Globus itself, was looking to whether the "flip-flopped" surgeons had in the previous twelve

months, been covered by either Terry or Curt, and not that the Richmond Defendants acted as a "team."

Second, the Court finds the Richmond Defendants testimony about what it means to be "assigned" an account compelling. For example, the Richmond Defendants testified that for the surgeons with whom they primarily worked, they were responsible for attending the surgery with the surgeon, preparing surgical trays, ensuring that all instrumentation was sterilized and ready for use, managing inventory in the hospital, restocking trays, training surgeons and staff, and introducing new products. They further testified that when they covered cases for one another, the covering sales representative was responsible none those actions, except for attending the surgery with the surgeon. For example, Curt McLeod testified that when a sales representative is covering a case for another sales representative, the covering sales representative "gets in and gets out," and the assigned sales representative takes care of all other responsibilities. As another example, although the Richmond Defendants shared Curt McLeod's sales representative number to order product, Globus did not present any evidence that the Richmond Defendants did, in fact, order product for one another. Only the "assigned" sales representative ordered products for surgeries. This evidence demonstrates that the Richmond Defendants had "direct and personal" contact with only their individually assigned sales representatives.[7]

---

[7] Perhaps the most compelling evidence Globus presented that the Richmond Defendants had "direct and personal" contact with each other's assigned surgeons and hospitals is that the Richmond Defendants were copied on weekly emails from schedulers. Globus presented evidence that the Richmond Defendants were copied on weekly emails from the scheduling coordinators at Johnston-Willis Hospital, and Memorial Regional Hospital. Globus emphasized that the weekly emails were sent to all Richmond Defendants, and that they did not ask to be taken off the emails. However, the evidence Globus presented demonstrated that only on one single occasion in their last twelve months affiliated with Globus did a sales representative other than the assigned representative respond to the email. In one email, in March 2022, Nicole McGhee, the scheduler at Memorial Regional, emailed Curt McLeod and Terry McLeod only—excluding Scott Brooks, who was the sales representative primarily associated with Memorial Regional at the time—with surgery information for Dr. Melisi. *See* Pl. Exh. 28. Curt McLeod responded to Nichole McGhee's email about a surgery "I just checked w[ith] Melisi's office, this case is a Lami without instrumentation," which Nicole McGhee confirmed to Curt McLeod. *Id.*

Third, during the last twelve months of their affiliation with Globus, Globus presented only limited evidence of sales representatives covering surgeries[8] for one another, including: Curt McLeod covered for Scott Brooks on four cases with Dr. Melisi; Terry McLeod covered for Scott Brooks on at least two cases with Dr. Melisi; and Scott Brooks covered for Terry McLeod for at least two cases with Dr. Herzog. Of those eight instances of coverage that Globus presented for the preceding twelve months, Terry McLeod and Scott Brooks are *currently* assigned to a surgeon they covered in that period. Globus argues that these facts demonstrate a collective assignment and invites the Court to equate these facts with the facts of *Allied Orthopedic Assocs., Inc. v. Leonetti*, No. cv 18-01566, 2018 WL 4051801, at *1 (E.D. Pa. Aug. 24, 2018).

In *Allied Orthopedic Associates*, the Court held that a medical equipment company was entitled to a preliminary injunction because the sales representative's territory extended "beyond the specific hospitals and surgeons to which [he] was assigned and instead encompass[ed] the broader area in which he was *active*." *Id.* at *10 (emphasis added). In that case, the court found it notable that the sales representative "serviced [the medical device company's] customers in and

---

At the evidentiary hearing, Globus attempted to discern which sales representative actually covered the case referenced in the email, but none of the Richmond Defendants could confirm who covered the case on this specific day, citing the hundreds of cases that they attend. Additionally, Globus attempted to use Symplar records from Curt and Terry McLeod to determine if either of them covered the case. *See* Def. Exh. 55. Symplar is a credentialing system used at the hospitals where the Richmond Defendants "swipe in" to the hospital. However, the Symplar records did not demonstrate either Curt or Terry McLeod "swiping in" on the date of the case referenced in the emails. Thus, the Court only takes into account the fact that on one single occasion, the scheduler at Memorial Regional excluded Scott Brooks, the assigned representative, from an email.

The Court finds that at best, it is unclear who actually covered the assigned case on that day, and that at best, based on the evidence presented at this hearing, the Symplar records are inconclusive and do not reliably show which representative was at the hospital on any given day.

[8] Globus argues that the evidence is unclear regarding how much the Richmond Defendants covered for one another during that year. However, it is Globus's burden to establish such evidence. *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 591 (E.D. Va. 2008) ("The party seeking the preliminary injunction bears the burden of proving that each factor supports granting relief.") (citation omitted).

around" its entire sales territory, that the sales representative covered cases for other sales representatives, and it was contemplated that the sales representative "would *often* cover additional hospitals and surgeons." *Id.* at \*9. The sales representative testified that when he did not have cases going on in his area, he would "offer to help in other areas," and that if he needed help in Delaware, somebody from Philadelphia might cover the case. *Id.* at \*9, n. 7. This Court finds the facts of *Allied Orthopedic* distinguishable. Mainly, in *Allied Orthopedic*, while the Court did not specify *how* often, the court noted that the sales representatives would *often* cover additional hospitals and surgeons, and that the sales representative would seek out additional work in other areas. In this case, the evidence demonstrated that during the last twelve months of their affiliation with Globus, the three Richmond Defendants covered eight cases total on behalf of each other, and it was not contemplated that they would seek out to cover more cases for each other, or any other sales representatives. Instead, the evidence demonstrated that the Richmond Defendants sought to *not* need coverage. For example, Terry McLeod testified that he would always to try to schedule his vacations contemporaneously with his surgeons' vacations to avoid needing another sales representative to cover for him. ECF No. 138 at 81. Similarly, during their last twelve months at Globus, when Scott Brooks covered two cases for Dr. Herzog on behalf of Terry McLeod, Terry McLeod set everything up before he left, and reassembled everything when he returned. Scott Brooks, as the covering sales representative "was just there to fill out paperwork." *Id.* at 80. That occasion was the first time that Scott Brooks met Dr. Herzog. The Court finds that unlike the situation in *Allied Orthopedic*, it was not contemplated that the NCNDA would extend beyond the specific hospitals and surgeons to which the sales representative was assigned. In the instant case, there is no evidence that the Richmond Defendants would affirmatively "offer to help" in each

other's sales territory.   Rather, the Richmond Defendants provided coverage in only limited circumstances, and performed only limited duties during the coverage of a surgery.

Finally, to the extent Globus argues that it has a protectable interest in confidential information to make it "reasonably necessary for its protection" to consider the Richmond Defendants assigned collectively, the Court finds that Globus did not present sufficient evidence preventing the Richmond Defendants from working with any surgeon or hospital that any one of them was assigned would have any bearing on the protection of Globus's confidential information. Globus has not presented any evidence to suggest that interpreting the Richmond Defendants as collectively assigned would reasonably protect their confidential information. As argued by the Richmond Defendants, whether collectively or individually assigned, they are still subject to non-disclosure covenants and not permitted to disclose any confidential information.

Under these facts and the evidence presented, the Court finds that it is not reasonably necessary for Globus's protection to interpret the Richmond Defendants as collectively assigned to the same surgeons and hospitals.   Globus itself contemplated the Richmond Defendants as individually assigned to certain hospitals and surgeons, and the Richmond Defendants' goodwill was developed by their direct and personal contact with hospitals and surgeons, as evidenced by the magnitude of their representation and allocated duties with individual surgeons and hospitals to whom they were assigned.   Further, construing "assigned" in the NCNDA to mean a collective assignment on behalf of the three Richmond Defendants does not reasonably protect Globus's confidential information.   Accordingly, the Court finds that the Richmond Defendants were individually assigned to certain surgeons and hospitals during their time at Globus.

Globus argues that in the alternative, the Richmond Defendants were individually assigned to all the same doctors and hospitals, meaning each Richmond Defendant was individually

assigned to Memorial Regional Hospital, Henrico Doctors' Hospital—Parham Campus, Chippenham Hospital, Johnston-Willis Hospital, and Drs. Reis, Melisi, Herzog, and Gocke. ECF No. 133 at 16. Globus bases its argument on the same facts it uses to argue that the Richmond Defendants were collectively assigned to the same hospitals and surgeons. *Id.* Although Globus generally concedes that the "flip-flopping" arrangement done properly does not violate the NCNDAs, Globus contends that if the Court does not find that the Richmond Defendants were collectively assigned, then the Court should find that each of the Richmond Defendants has solicited, called on, sold, and/or marketed SeaSpine products to one or more of the surgeons or hospitals to which he was individually assigned for Globus. *Id.* at 16–21. Based on the analysis above, the Court rejects this argument, and concludes that during their last twelve months at Globus, Curt McLeod was assigned to Chippenham Hospital and Dr. Gocke; Terry McLeod was assigned to Johnston-Willis Hospital and to Dr. Herzog; Scott Brooks was assigned to Memorial Regional Hospital, Henrico Doctors' Hospital – Parham, as well as to Dr. Reis, and to Dr. Melisi.

            b. <u>Globus Did Not Present Sufficient Evidence that the Richmond Defendants are Soliciting, Calling on, Interfering With, or Attempting to Divert, Entice Awat, Sell to, or Market to, the Surgeons and Hospitals to Which they were Assigned During Their Last Twelve Months with Globus.</u>

With respect to the second step of the inquiry, if the Richmond Defendants are not collectively assigned to the same surgeons and hospitals, the Court must look to whether they are currently "directly or indirectly . . . solicit[ing], call[ing] on, interfere[ing] with, or attempt[ing] to divert, entice away, sell to or market to" any surgeons or hospitals to which they were "assigned" during their last twelve months of their affiliation with Globus, in violation of their NCNDA, to establish a likelihood of success on the merits of Globus's breach of contract claim. In doing so, the Court is mindful that "'[t]he purpose of an injunction is to prevent future violations.'" *Davison*

*v. Rose*, 19 F.4th 626, 641 (4th Cir. 2021) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)).

A large portion of the evidence Globus presented involved *past* potential violations of the non-compete and non-solicitation clauses of the NCNDA in the time leading up to the dissolution of the Richmond Defendants' relationship with Globus, which are not the proper subject of an injunction. For example, Globus presented evidence that in his last twelve months of affiliation with Globus, Curt McLeod and Dr. Herzog went to the same trip to SeaSpine in May 2022, and in that timeframe, Curt may have assisted Dr. Herzog in creating custom SeaSpine instruments. However, in determining whether injunctive relief is appropriate, the Court must consider what *prospective* relief it can fashion to prevent future violations. *See Davison*, 19 F.4th at 641. Past violations of the NCNDA are properly addressed in Globus's claim for monetary damages.

In terms of evidence that the Richmond Defendants are *presently* "directly or indirectly . . . solicit[ing], call[ing] on, interfere[ing] with, or attempt[ing] to divert, entice away, sell to or market to" any surgeons or hospitals to which they were "assigned" during their last twelve months of their affiliation with Globus, in violation of their NCNDA, Globus presented one instance of a direct violation of the NCNDA, when Scott Brooks covered a case for Dr. Melisi in the fall of 2022. Because Scott Brooks was assigned to Dr. Melisi in his last twelve months at Globus, covering a surgery for Dr. Melisi was clearly prohibited by the NCNDA. Scott Brooks knew he was prohibited from covering this surgery but did so anyway.

Other than this single concrete instance of a potential violation, Globus presented speculative evidence that the Court cannot find "clearly establishes" Globus's likelihood of success on the merits. Globus pointed to extensive calls between the Richmond Defendants, after August 3, 2022, and a close relationship between Scott Brooks and Dr. Reis (for example, they are

neighbors and attended a football game together paid for by Dr. Reis's practice).  While the Richmond Defendants' phone calls may have very well involved discussions regarding their surgeons, the Court cannot say that the evidence presented—phone calls in close proximity, without more—can allow it to find Globus has clearly established that such calls constitute the Richmond Defendants directly or indirectly soliciting, calling on, interfering with, or attempting to divert, entice away, or sell to or market to surgeons to whom they were assigned in their last twelve months at Globus.  Similarly, Globus's presentation of evidence that Scott Brooks maintains a close friendship with Dr. Reis, without more, is insufficient to reach the conclusion that Scott Brooks is directly or indirectly soliciting, calling on, interfering with, or attempting to divert, entice away, or sell to or market to Dr. Reis.

### c. Under These Circumstances, Globus Has Not Demonstrated a Clear Likelihood of Success on the Merits.

Under these circumstances, the Court finds that Globus cannot demonstrate a clear likelihood of success on the merits of its breach of contract claim *to warrant injunctive relief*. Because the restrictive covenant at issue is only enforceable to the extent necessary to protect its goodwill, and Globus's goodwill only extends to the Richmond Defendants individual assignments, Globus cannot establish a clear likelihood of success on the merits of its breach of contract claim to the extent the Richmond Defendants are currently violating their NCNDA by "flip flopping" surgeons and hospitals.  To be clear, the Court makes no findings whatsoever with respect to the Richmond Defendants past potential violations of the NCNDA leading up to August 4, 2022, when the Richmond Defendants began selling SeaSpine products, for which Globus may receive damages.  The Court's only finding is that with respect to obtaining a preliminary injunction, the Richmond Defendants' practice of flip-flopping once they began selling SeaSpine does not violate their NCNDAs because they were not collectively assigned to the same surgeons

33

and hospitals, and Globus has not presented sufficient evidence to establish the Richmond Defendants are currently violating the covenants in their NCNDAs.  Further, to the extent Globus has additional evidence that the Richmond Defendants have violated their NCNDAs since they began selling SeaSpine products by "directly or indirectly . . . solicit[ing], call[ing] on, interfere[ing] with, or attempt[ing] to divert, entice away, sell to or market to" any surgeons or hospitals to which they were "assigned" during their last twelve months of their affiliation with Globus, Globus will have an opportunity to present that evidence during a trial on the merits of its claim.

### 2. Irreparable Harm

When considering irreparable harm, "a plaintiff must demonstrate more than just a 'possibility' of irreparable harm." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citing *Pashby*, 709 F.3d at 321). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (internal quotations omitted)).  Irreparable harm must also be "actual and imminent," and not "remote or speculative." *Id.* (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F2d 802, 812 (4th Cir. 1991)).  In the Fourth Circuit, "[t]he threat of a permanent loss of customers and the potential loss of goodwill [] support a finding of irreparable harm." *Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018) (citing *Multi-Channel TV Cable Co.*, 22 F.3d at 552)).

Globus argues that if the Court does not issue an injunction, it will be irreparably harmed by the loss of customer relationships and goodwill.  ECF No. 133 at 32–33. According to Globus, its harm is not limited to the revenue attributable to the Richmond surgeons and hospitals, but that

if the Richmond Defendants arrangement continues, Globus may permanently and irreparably be deprived of its goodwill and relationship with these customers. *Id.* The Richmond Defendants do not address the potential loss of customer relationships and goodwill, but rather focus on the evidence at the hearing that Globus was able to quantify its losses, and that an injunction is not warranted if the party can be compensated by an award of monetary damages. ECF No. 132 at 31–34. The Richmond Defendants further argue that Globus is not irreparably harmed because it has retained some of its business with the Richmond surgeons and hospitals with whom the Richmond Defendants had relationships. *Id.* Lastly, the Richmond Defendants argue that Globus cannot argue it will be irreparably harmed absent an injunction because Globus did not file for a temporary restraining order, did not amend its motion for a preliminary injunction to include the Richmond Defendants until November 2022, filed a spoliation motion, and engaged in extensive discovery, all of which are inconsistent with the required urgency to establish irreparable harm. *Id.*

The undersigned finds that the irreparable harm factor favors Globus. While some of the surgeons and hospitals to whom Richmond Defendants sold Globus products remain Globus customers and still purchase spinal products (for example, Dr. Gocke never switched to SeaSpine), others completely stopped using Globus spinal products once the Richmond Defendants began selling SeaSpine. For example, neither Dr. Reis nor Dr. Herzog currently use Globus spinal products with any regularity, and certainly not at the frequency they did during the Richmond Defendants' last twelve months affiliated with Globus. In the last twelve months that the Richmond Defendants were affiliated with Globus, Globus's sales for Dr. Reis totaled $2.6 million, and Globus's sales for Dr. Herzog totaled $1.7 million. Since the Richmond Defendants began selling SeaSpine, Globus has not had any cases using spinal hardware with Dr. Reis or

Melisi, and fewer than five cases with Dr. Herzog. The Court does not find, under the facts of this case, that Globus should be prevented from arguing irreparable harm based on delays in this case.

Nonetheless, Dr. Herzog and Dr. Reis still have some relationship with Globus, which somewhat undercuts Globus's argument that they are threatened with the potential loss of goodwill and permanent loss of customers. For example, Dr. Herzog is a design consultant for Globus, and teaches some courses for Globus, and Dr. Reis still uses Globus's robot and maintains a service contract with Globus for that robot. Moreover, as explained above, Globus is largely able to quantify some of its losses.

In light of the evidence presented, Globus has identified that it is faced with the threat of a permanent loss of customers and the potential loss of goodwill, and based on Fourth Circuit precedent, this is sufficient to find it may suffer irreparable harm absent preliminary relief. *Update, Inc.*, 311 F. Supp. 3d at 796 (E.D. Va. 2018). Accordingly, while there is some evidence cutting against Globus's argument for irreparable harm, this factor still favors Globus.

### 3. Balance of the Equities

Globus must also establish that "the balance of equities tip in [its] favor." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). In considering the balance of the equities, the Court must compare the party seeking an injunction's likely harm absent preliminary relief, with the potential harm that the party opposing the injunction if the court grants the preliminary injunction. *See Mt. Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 367 (4th Cir. 2019).

Here, Globus argues that its harm—the loss of business and influence in the area, and the lack of a chance to regain that business—outweighs any possible harm to the Richmond Defendants. ECF No. 133 at 33–34. Specifically, Globus argues that it would be harmed because it has already lost 90% of its business in the Richmond area, and Drs. Herzog, Reis, and Melisi

36

hardly use Globus products since the Richmond Defendants began selling SeaSpine products. *Id.* at 21–22. It further contends it is harmed because the Richmond surgeons "influence each other," such that if Globus loses these surgeons' business, it may cause them to lose other business as well. *Id.* As for the harm to the Richmond Defendants, Globus contends they are not harmed because they each have an indemnification agreement with SeaSpine, providing each of them with a substantial sum per month if an injunction prevents them from selling SeaSpine products. *Id.* at 33–34. Further, the requested injunction does not cause great harm to the Richmond Defendants because it does not prevent the Richmond Defendants from working entirely, but rather, it only applies to four Richmond surgeons and hospitals, and the Richmond Defendants would be free to sell SeaSpine to non-restricted surgeons and hospitals.

In response, the Richmond Defendants argue that without an injunction, Globus completely retained the business of Dr. Gocke, and still maintains a relationship with Dr. Herzog and Dr. Reis. ECF No. 132 at 32. The Richmond Defendants argue that Globus's alleged concern about the Richmond surgeons influencing other surgeons to not use Globus products is speculative, especially because the evidence demonstrates that Dr. Gocke, Dr. Herzog, and Dr. Reis still maintain a relationship with Globus. *Id.* The Richmond Defendants further argue that the indemnification from SeaSpine is only about half the sum that they earn monthly, and thus, their income would be cut in approximately half if they were subject to an injunction. ECF No. 132 at 34.

The undersigned finds that the balance of equities does not tip in Globus's favor. Despite not having an injunction, Globus was able to maintain some of its business in the Richmond area (mainly, Dr. Gocke), and still maintains relationships with other Richmond surgeons and hospitals. Globus further represented that has been able to compete in the Tidewater by sending in alternative

sales representatives.  Though Globus maintains it has lost about 90% of its business in the Richmond area, it does not explain in more than speculative terms how an injunction would *now* allow it to regain that business.  Finally and most importantly, because the Court found that the Richmond Defendants were individually assigned for purposes of the NCNDA, and thus Globus cannot establish it is likely to succeed on the merits of its breach of contract claim with respect to the Richmond Defendants process of flip-flopping, it would significantly harm the Richmond Defendants to subject them to an injunction that prevents actions that the NCNDA does not prohibit.[9]  Under these circumstances, the undersigned notes that while both Globus and the Richmond Defendants may suffer harm, Globus has not established that the balance of equities tips in its favor.

### 4.  Public Interest

As for the public interest, courts in the Eastern District of Virginia have held that it is in the public's interest to protect companies' confidential information, enforce and uphold valid contracts, and protect the legitimate expectations of contracting parties. *See Home Funding Grp., LLC v. Myers*, No. 1:06-cv-1400, 2006 WL 6847953 (E.D. Va. Dec. 14, 2006) (finding that injunctive relief serves the public interest by allowing firms to protect confidential information and by enjoining further breaches that would destroy incentives for companies to innovate).

However, recently, on January 5, 2023, the Federal Trade Commission ("FTC") published a Notice of Proposed Rulemaking, proposing a "Non-Compete Clause Rule," which would essentially forbid non-compete clauses.  Non-Compete Clauses, 88 Fed. Reg. 3482 (proposed Jan.

---

[9] Further, because the Court found that the Richmond Defendants were individually assigned to surgeons and hospitals during the last twelve months of their affiliation with Globus, it would certainly be harmful to subject the Richmond Defendants to an injunction based on a NCNDA provision that Globus abandoned with respect to the Tidewater Defendants.  In other words, it would be harmful to the Richmond Defendants, who are in the same position as the Tidewater Defendants, to block them from "flip-flopping" when the Tidewater Defendants with the same NCNDA covenants are not subject to the same restrictions.

19, 2023) (to be codified at 16 CFR § 910.1(b)(1)), 2023 WL 255956 (Jan. 19, 2023). The proposed rule states that "[i]t is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or represent to a worker that the worker is subject to a non-compete clause where the employer has no good faith basis to believe that the worker is subject to an enforceable non-compete clause." Non-Compete Clauses, 88 Fed. Reg. 3482 (proposed Jan. 19, 2023) (to be codified at 16 CFR § 910.2(a)), 2023 WL 255956 (Jan. 19, 2023). The Notice of Proposed Rulemaking notes that the FTC "seeks to ensure competition policy is aligned with the current economic evidence about the consequences of non-compete clauses" because, in the FTC's view, "the existing legal frameworks governing non-compete clauses—formed decades ago, without the benefit of this evidence—allow serious anticompetitive harm to labor, product, and service markets to go unchecked." Non-Compete Clauses, 88 Fed. Reg. 3482 (proposed Jan. 19, 2023), 2023 WL 255956 (Jan. 19, 2023). Accordingly, the proposed rule would mandate that "an employer that entered into a non-compete clause with a worker prior to the compliance date must rescind the non-compete clause no later than the compliance date. Non-Compete Clauses, 88 Fed. Reg. 3482 (proposed Jan. 19, 2023) (to be codified at 16 C.F.R. § 910.2(b)(1)), 2023 WL 255956.[10]

Globus argues that injunctive relief is in the public interest because the public interest favors the protection of confidential business information, the enforcement of valid contracts, and

---

[10] The comment period on the proposed rule ended on April 19, 2023. Federal Trade Commission, FTC Extends Public Comment Period on Its Proposed Rule to Ban Noncompete Clauses Until April 19, (last visited Aug. 4, 2023, 9:33 AM), https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-extends-public-comment-period-its-proposed-rule-ban-noncompete-clauses-until-april-19; 88 Fed. Reg. 20,441-01, 2023 WL 2785724 (Apr. 6, 2023). The FTC is not expected to vote on the rule until 2024. Bloomberg Law, *FTC Expected to Vote in 2024 on Rule to Ban Noncompete Clauses* (May 10, 2023, 4:32 PM), https://news.bloomberglaw.com/antitrust/ftc-expected-to-vote-in-2024-on-rule-to-ban-noncompete-clauses.

because it is in the public interest to encourage companies to invest resources in cultivating customer relationship and goodwill. ECF No. 133 at 34–35. The Richmond Defendants argue that an injunction does not serve the public interest because it would interfere with patient care. ECF No. 132 at 35. As for the FTC's proposed rule, Globus argues that the proposed rule is irrelevant and should not have any bearing on the Court's decision because the rule is only a proposed rule that has not yet been adopted by the FTC, it distinguishes between highly compensated employees and lower wage workers, and courts across the country have granted preliminary injunctions since the issuance of the proposed rule. ECF No. 134 at 2–6. On the other hand, the Richmond Defendants contend that although the proposed rule is not final, the rule itself aligns with Pennsylvania policy that restrictive covenants are a restraint on trade that requires higher scrutiny and narrow application to be enforceable. ECF No. 135 at 1–4.

The undersigned finds that the public interest does not tip in favor of Globus because it is not in the public's interest to subject the Richmond Defendants to the injunction that Globus requests. While it is in the public interest to enforce valid contracts, given the Court's finding that the Richmond Defendants were individually assigned doctors, the injunction Globus requests would not protect the legitimate expectations of the parties—that is, that the Richmond Defendants would only be prevented from servicing the hospitals and surgeons to which they were assigned. Moreover, while the undersigned recognizes that the FTC's proposed rule may not take effect, the undersigned is also mindful of this national discussion and the suggestion that non-compete clauses are no longer in the public interest. Though not binding, the FTC's proposed rule suggests the public interest in enforcing non-compete agreements may no longer be a viable argument for litigants in cases similar to the one before the Court here. Under these circumstances, the

undersigned finds that the public interest does not favor granting Globus's request for an injunction.

## C. Globus is Not Entitled to a Preliminary Injunction.

As explained above, each preliminary injunction factor must be "'satisfied as articulated.'" *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (citation omitted). While Globus was able to show that it could suffer irreparable harm in the absence of a preliminary injunction, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Considering the undersigned's analysis above, Globus has failed to carry its burden to demonstrate a clear likelihood of success on the merits for its breach of contract claim, that the balance of equities tips in its favor, and that the public interest is served by injunctive relief. Accordingly, the Court finds that Globus is not entitled to preliminary relief.

## D. Biologics

Part of Globus's injunction request relates to the sale of biologics products[11]. During the evidentiary hearing, Globus presented some evidence that the Richmond Defendants were selling biologics products, specifically, Vivex and Bioventus, that are competitive with Globus products, and still do so today. Globus is not entitled to an injunction with respect to biologics products because the evidence presented does not demonstrate that Globus has clearly established a likelihood of success on the merits with respect to biologics.

---

[11] Biologics are a "soft[er], often putty-like material that surgeons use on patients after the rods and screws are in to promote bone fusion and healing." ECF No. 136 at 20.

Defendant's motion in limine that the Court resolved prior to the evidentiary hearing sought to exclude evidence of biologics on the grounds that evidence relating to biologics was irrelevant because Globus's biologics are not competitive with the biologics that the Defendants were selling. In ruling on that motion, the undersigned found "[i]f anything, Defendants' motion demonstrates that the competitive nature of Globus's biologics products and the Defendants' sale of other biologics products is a fact-specific issue that requires evidence regarding which products were for sale, at what time, and which Defendants were selling what products" and "[t]he determination of the competitive nature of Globus's products and any irreparable harm to Globus by the Defendants' sale of biologics products is more appropriately determined after hearing evidence at the preliminary injunction hearing." ECF No. 103 at 5.

As was the case in resolving the motion in limine, crucial to the question of whether the Richmond Defendants violated and are violating their NCNDAs with respect to biologics is the extent to which Vivex and Bioventus biologics are competitive with Globus's biologics. During the evidentiary hearing, Globus presented some evidence that the Richmond Defendants sold Vivex and Bioventus biologics products. However, the Court did not hear any evidence how, why, or the extent to which Vivex and Bioventus biologics are competitive with Globus's biologics products. Globus did not mention biologics once in its proposed findings of fact and conclusions of law. *See* ECF No. 133. Accordingly, Globus has failed to provide sufficient evidence to find that the Richmond Defendants' sale of such products violates their NCNDAs. Because Globus has not established a clear likelihood of success on the merits with respect to biologics, *see Pashby*, 709 F.3d at 320, Globus is not entitled to a preliminary injunction prohibiting the Richmond Defendants from selling biologics products.

## IV.     RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that Globus's Amended Motion for a Preliminary Injunction, ECF No. 63, be **DENIED**.

## V.     REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1.  Any party may serve on the other party and file with the Clerk of this Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2.  The United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to all counsel of record.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
August 15, 2023

43